UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-

D-8 JUAN DE OLEO,

        Defendant.
_____/

No. 09-CR-20221-08

Hon. Denise Page Hood

Vios: 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud)
18 U.S.C. § 1347 (Health Care Fraud)
18 U.S.C. § 1957 (Money Laundering)

Max. Sentence: 80 years and/or $3,578,469.48 fine and three years supervised release

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America hereby submits this Memorandum in Aid of Sentencing pertaining to defendant Juan De Oleo. On December 16, 2009, defendant De Oleo was charged in a Second Superseding Indictment with one count of conspiracy to commit health care fraud (18 U.S.C. § 1349); five counts of health care fraud (18 U.S.C. §§ 1347 and 2); and two counts of money laundering (18 U.S.C. § 1957). De Oleo went to trial and, on August 27, 2010, was found guilty on all eight counts. For the reasons discussed below, the United States requests that the Court: (1) impose a sentence of 168 months, which is within the sentencing guidelines as calculated by both the Probation Department and the government, (2) impose a three year term of supervised release, and (3) order De Oleo to pay restitution in the amount of $1,789,234.74, jointly and severally with his co-conspirators in the fraud.

## I.     FACTUAL BACKGROUND

On August 27, 2010, Juan De Oleo was convicted on one count of conspiracy to commit health care fraud, five counts of health care fraud and two counts of money laundering in connection with an infusion therapy scheme at Xpress Center, Inc. (Xpress Center), a medical clinic located at 16977 Farmington Road, Livonia, Michigan.  While it was his first conviction for such offenses, the testimony at trial and witness statements clearly show that De Oleo is no stranger to fraud.  His conviction was simply the first time De Oleo got caught.

De Oleo and his co-conspirators imported the infusion fraud scheme employed at Xpress Center from Miami to Detroit.  In Miami, De Oleo and others had successfully operated a similar scheme at a clinic called O&M Medical and Diagnostic Center, Inc. (O&M).  And, after law enforcement shut down Xpress Center, De Oleo attempted to establish another fraudulent infusion clinic in the Detroit area, Rosenberg Life Center, Inc. (Rosenberg).

De Oleo is one of several individuals who came from Miami to the Detroit area when Medicare began to scrutinize some of the schemes being employed by fraudulent clinics in South Florida.  De Oleo and other Miami natives targeted Detroit because of its large poor and disabled population, which meant there were numerous Medicare beneficiaries whose Medicare information could be bought and exploited through relatively modest bribes and kickbacks.

Indeed, De Oleo and his co-conspirators targeted the sickest of Medicare beneficiaries to exploit, HIV positive patients in Miami and HIV and Hepatitis C positive patients in Detroit. The purpose of seeking individuals with these diagnoses was not to provide them needed care.  It was to provide a medical justification for billing Medicare millions of dollars for very expensive,

exotic infusion therapy drugs that was never provided.  The testimony at trial showed that De Oleo and his co-conspirators believed they could medically justify billing Medicare for the drugs they billed if the patients had HIV or Hepatitis C.

De Oleo's conduct at Xpress Center, O&M and Rosenberg are set forth in more detail below.

### A. <u>Xpress Center</u>

In approximately September 2006, De Oleo was approached by Jose Rosario with an offer to co-own a fraudulent infusion clinic in Detroit along with Rosario's partner, Daisy Martinez.  Jose Rosario had previously been partners with both De Oleo and De Oleo's wife, Rosa Genao, in fraudulent infusion clinics in the Miami area.  De Oleo agreed to the arrangement.  In exchange for investing in Xpress Center, the conspirators also agreed that De Oleo was to receive a share of any profits from the scheme.

From the beginning, De Oleo knew that Xpress Center's sole purpose was to defraud Medicare and that the clinic's profits would be the proceeds of Medicare fraud.  De Oleo recruited Dulce Briceno to operate Xpress Center on a day-to-day basis.  De Oleo had worked with Briceno at another infusion clinic in the Miami area, RPG Medical Care.  Martinez, Rosario, and De Oleo agreed to provide Briceno with funds to open the clinic and to share their expertise in operating fraudulent injection and infusion therapy clinics with Briceno.  De Oleo kept in daily communication with Briceno about what was occurring at the clinic.  De Oleo, however, made sure to keep his name off the clinic's corporate records and Medicare documentation to avoid any official association with Xpress Center.

Xpress Center also employed Arnaldo Rosario, Jose Rosario's nephew, to manage the two patient recruiters at the clinic, Terrence Hicks and Wayne Smith. De Oleo had also worked with Arnaldo Rosario at fraudulent infusion therapy clinics in the Miami area prior to Xpress Center, including O&M and a clinic called Heart USA. Arnaldo Rosario's job at those clinics was the same it was at Xpress Center: to manage patient recruiters and pay kickbacks. As noted above, the patients Arnaldo Rosario, Terrence Hicks and Wayne Smith recruited to Xpress Center were overwhelmingly poor, HIV or Hepatitis C positive African-American men, many with substance abuse problems, from downtown Detroit; it was a similar patient population to that De Oleo and his co-conspirators exploited in the Miami infusion therapy schemes.

For the clinic to operate, it needed to hire a physician that would agree to prescribe the infusion drugs De Oleo and his co-conspirators would bill to Medicare and not ask questions. De Oleo and his co-conspirators agreed upon Brandi Jenson, a physician with a substance abuse problem so severe that it claimed her life in April 2010. Trial testimony revealed that De Oleo joked with Martinez, Rosario, Briceno and others about how Jensen's substance abuse problems would make her so easy to control.

Unfortunately, Jenson's problems compromised her ability to create legible, audit-proof patient files. To rectify this problem, De Oleo enlisted the help of his wife, Dr. Rosa Genao, to prepare falsified medical records that purported to justify the administration of the expensive and exotic medications Xpress Center billed Medicare.

Almost none of the medications De Oleo and his co-conspirators billed – or falsified medical records to justify – were actually administered to the HIV and Hepatitis C positive beneficiaries recruited to Xpress Center. Evidence at trial showed that De Oleo and his co-

conspirators purchased only a small fraction of the expensive medications that were billed to Medicare. De Oleo was aware that the clinic did not purchase the medications it billed to Medicare and was aware the medications were never actually provided.

From in or about September 2006 through in or about March 2007, De Oleo and his co-conspirators caused the submission of approximately **$2,357,955.95** in false and fraudulent claims to be submitted to the Medicare program for services allegedly provided at Xpress Center. Medicare actually paid approximately $1,789,234.74 on these false and fraudulent claims.

De Oleo personally deposited tens of thousands of dollars of the proceeds of the fraud into accounts controlled by him. In addition, records and trial testimony showed that the conspirators attempted to transfer hundreds of thousands of dollars more to De Oleo, but such attempts were not successful before law enforcement froze the Xpress Center bank account.

### B. O&M

O&M was another clinic owned and operated by De Oleo in Miami, Florida prior to opening Xpress Center. According to corporate records, De Oleo was the registered agent and President. On December 20, 2004, Juan De Oleo signed a Medicare Application 855B in order to obtain a Medicare Provider Identification Number for O&M. On December 27, 2004 De Oleo and Rosa Genao signed and subsequently submitted a Medicare Application 855R to Medicare in order to obtain a Medicare Provider Identification Number. Claims by O&M were submitted to Medicare between April 7, 2005 and November 8, 2005.

At trial and in previous interviews, Jose Rosario stated that he was a partner in O&M, assisting its operations by recruiting HIV positive Medicare beneficiaries to the scheme. *See* Ex. A (7/20/10 Jose Rosario OI-3) at 2-3 (describing De Oleo's and Rosario's role in O&M). Jose

5

Rosario and Arnaldo Rosario told law enforcement that they paid kickbacks and bribes to HIV positive patients to provide their Medicare information to O&M.  *See id.* at 2; Ex. B (7/14/09 Arnaldo Rosario FD-302) at 2-3 (describing O&M kickback scheme, and De Oleo's role in clinic); Ex. C (7/21/10 Arnaldo Rosario OI-3) at 2.   Jose Rosario told agents, he engaged in this activity on both his own and De Oleo's behalf as owners of O&M.  Ex. A at p. 2.

According to both Jose Rosario and Arnaldo Rosario the clinic was a complete fraud.  O&M billed Medicare for expensive medications the patients did not need the medications and did not receive.  *See* Ex. C at 1 (patients did not get anything except Vitamin B-12 injections, if requested); Ex. A at 3 (same).  The Medicare claims data verifies the Rosarios' claims.  O&M billed Medicare for expensive, but medically unnecessary, medications including octreotide, an powerful anti-diarrhea drug also billed by Xpress Center.  Jose Rosario told agents that he and Genao, the O&M physician on staff, joked about how if they actually administered the amount of octreotide they billed to Medicare at O&M, the patients would never be able to go to the bathroom again.  *Id.*

O&M was only in operation for approximately six months.  In that short time, De Oleo and his co-conspirators submitted approximately **$6,532,641.06** in claims to the Medicare program.  Medicare paid $1,156,021.54 on those claims, all of those funds going into a bank account controlled by Juan De Oleo.

### C. Rosenberg

Rosenberg was another Detroit-area clinic opened by De Oleo and co-conspirators in the Detroit area, located at 5217 Heather Drive, Suite 210, Dearborn, Michigan 48126.  Rosenberg began operations in May 2007, just months after Xpress Center was closed.  *See* Ex. D (8/3/10

6

Jose Rosario FD-302) at 2 (describing De Oleo's role in Rosenberg scheme). De Oleo was an owner of Rosenberg. *Id.* He provided funding for the clinic in return for a percentage of the clinic's profits. *Id.* According to Arnaldo Rosario, Rosenberg operated the same way as the other clinics, patients were paid to attend the clinic; the patients did not need any of the medications billed to Medicare by the clinic; and the clinic never bought the medications it billed to Medicare. Ex. B at p. 9. Rosenberg billed Medicare **$220,787.46**, and Medicare actually paid $19,649.36 on those claims.

## II. DISPUTED SENTENCING ISSUES

### A. Amount of Loss: Relevant Conduct – Other Fraudulent Infusion Clinics

Defendant De Oleo was involved with at least three fraudulent infusion clinics from late 2004 until early 2007, which involved the same co-conspirators and the same scheme. De Oleo's participation in these other clinics is relevant conduct pursuant to Section 1B1.3(a)(2), and should be grouped together for sentencing purposes. Because Medicare reimburses Medicare Part B providers 80% of the billed amount, the government submits that the proper figure reflecting intended loss for Defendant De Oleo is 80% of the $9,111,384.47 billed at Xpress Center, O&M and Rosenberg, or **$7,289,107.58**.

The Probation Department also calculated the intended loss at this amount. *See* PSR at ¶¶ 16-21, 29.

De Oleo argues that the loss figure should be determined by reference to the amount paid, not billed, claiming that using the billed amount violates the Due Process clause. He cites no case law in support of this proposition. Nor does he reference any guidance in from the sentencing guidelines.

7

The loss figure in this case must be based on intended loss, not actual loss, because the intended loss is higher than the actual loss. The application notes to Section 2B1.1 state that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* The Application Notes further provide that the "court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C). In *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009), the Sixth Circuit held that "[w]hen determining the amount of loss for sentencing purposes, 'a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof.'") (quoting *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004)).

The best evidence of what Defendant intended to steal from Medicare is what she and her co-conspirators actually billed to Medicare. *See Martinez*, 588 F.3d at 326 (affirming court's finding of loss based on bills submitted to Medicare); *United States v. Culberson*, No. 07-2390, 2009 WL 776106, at *3 (6th Cir. Mar. 24, 2009) (affirming district court finding of loss in health care fraud case where court "found that the best evidence of what [defendant] attempted to obtain was the fraudulent bills that he submitted to [health insurance company]"). Indeed, Congress has specifically endorsed this method of calculating loss in the recently enacted Patient Protection and Affordable Care Act of 2010 ("PPACA"). The PPACA provides that "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss by the defendant." Pub. L. No. 111-148 at §10606(a)(2)(B).

8

Both this Court and others within this district have used the intended loss – the amount billed – to determine loss. De Oleo has present no basis from deviating from that practice.

**B. <u>Enhancement for Sophisticated Means</u>**

A two-level enhancement for sophisticated means pursuant to United States Sentencing Guidelines ("USSG") § 2B1.1(b)(9) is appropriate in this case because the overall scheme, including De Oleo's participation, was sophisticated. According to the Application Notes to Section 2B1.1, the sophisticated means enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The Sixth Circuit had held that a series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is "especially complex" or "especially intricate." *United States v. Tandon*, 111 F.3d 482, 491 (6th Cir. 1997); *see also United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005) ("Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.").

The scheme involved sophisticated means at all levels. The participants in the fraud, including De Oleo, moved the scheme from south Florida to the Detroit metropolitan area to evade the high level of law enforcement scrutiny in south Florida. *See* Ex. E at 9 (7/15/09 Jose Rosario FD 302) (De Oleo told Jose Rosario he wanted to open a clinic in Detroit). Further, the scheme involved "especially intricate offense conduct pertaining to the execution or concealment of an offense." In this case, De Oleo and his co-conspirators went to intricate lengths to conceal the offense. They recruited HIV and Hepatitis C positive Medicare beneficiaries to justify the drugs they would bill to Medicare. De Oleo enlisted Rosa Genao to create false patient files, which indicated that the patients of Xpress Center needed the medications being billed by the

9

clinic to Medicare. The files contained elaborate justifications for the medications. De Oleo and other co-conspirators used shell companies to conceal the disbursement of the proceeds of the fraud.

The Probation Department determined that a sophisticated means enhancement should apply.

### C. Enhancement for Aggravating Role

A four-level enhancement for aggravating role under Section 3B1.1(a) is appropriate for De Oleo because he was a leader and organizer of the fraud at Xpress Center, and the fraud involved five or more participants. Among other things, De Oleo provided upfront funding to open the clinic; he personally recruited the clinic's day-to-day manager, Dulce Briceno; he provided daily advice to Briceno on how to run the clinic; he recruited his wife, Rosa Genao, to help falsify the medical files at the clinic; and he was one of the owners of the clinic, who received a large portion of the fraudulent proceeds of the clinic.

The Probation Department determined that a four-level enhancement for aggravating role should apply in this case.

### D. Enhancement for Obstruction of Justice

A two-level enhancement under Section 3C1.1 is appropriate for Mr. De Oleo because he directed the falsification, destruction and alteration of records. The Probation Department does not agree with the application of this enhancement because it states that there is insufficient information showing that De Oleo aided, abetted, counseled, commanded, induced, procured or willfully caused Genao and others to alter and destroy documents in anticipation of a government investigation.

Conduct to which this adjustment applies is not merely where a defendant personally "destroy[s] or conceal[s]," evidence, but also where he "direct[s] or procur[es] another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, n. 4(D) (Examples of Covered Conduct). *See United States v. Shutters*, 163 F.3d 331, 339-40 (6th Cir. 1998) (upholding 3C1.1 obstruction of justice enhancement where district court found defendant directed another to destroy evidence); Section 3C1.1, n. 9 ("Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured or willfully caused.").

In an interview with law enforcement, Genao told agents that she came to Detroit to work on Xpress Center medical files at De Oleo's direction. Exhibit F at p. 2 (09/08/09 Rosa Genao Interview). Thus, De Oleo's wife confirms that De Oleo directed her to travel to the Detroit area to help falsify medical files at Xpress Center. As established at trial, the purpose of these efforts to alter or detroy the patient records at Xpress Center was to prevent Medicare from discovering the nature of the fraudulent scheme. *See* Ex. E at 7 (purpose of Genao's trips to Detroit to "update" charts was to deceive Medicare in case of an audit). Indeed, Genao was convicted under an obstruction statute of destroying or altering records to impede an actual or anticipated investigation under 18 U.S.C. § 1519. Both the evidence at trial and Genao's own statement to law enforcement confirms that she engaged in this conduct at De Oleo's direction.

Thus, the government respectfully disagrees with the Probation Department and submits that a two-level enhancement for obstruction is warranted.

### III. SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing defendant De Oleo. Factors pertinent to the instant offense are discussed below, numbered as they are in Section 3553(a).

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant.**

**(A) Nature and circumstances of the offense**

As set forth more fully in the Factual Background (Section I), De Oleo was a leader and organizer of the Xpress Center fraudulent scheme. He was a partner in the fraudulent clinic and directed its activities. By recruiting his wife and others into the scheme and directing the falsification of materials, he helped his co-conspirators conceal the crime from Medicare and law enforcement. Further, De Oleo has engaged in similar fraud schemes before and after the activities at Xpress, both in Miami and in the Detroit area.

The nature and circumstances of this offense is very serious, and the damage De Oleo has done to the Medicare program over several years and in multiple cities was severe.

**(B) The history and characteristics of the defendant**

De Oleo is a 51 year old man with no prior convictions. That notwithstanding, the crimes he was convicted of were very serious, exploiting a particularly vulnerable population of sick and disabled Medicare beneficiaries for his personal gain. And, as the evidence at trial and attached to this sentencing memorandum show, this might be De Oleo's first conviction, but it is not his first foray into Medicare fraud. De Oleo had made hundreds of thousands of dollars off of multiple Medicare fraud schemes prior to being convicted in this case.

> **(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

Defendant De Oleo's punishment should take into account not only the scope and seriousness of his criminal conduct, which is described above, but also the need to deter future criminals from stealing from the Medicare program. The National Health Care Anti-Fraud Association, an organization composed of both public and private health insurers and regulators, conservatively estimates that 3% of all health care spending in the United States is lost due to fraud. If such an estimate is accurate, health care fraud cost our economy a staggering $68 billion in 2007, the most recent year for which figures are available. Furthermore, health care fraud is both a major national problem and a major local one.

In the last 20 months, at least 120 individuals have been indicted in the Eastern District of Michigan in connection with a number of Medicare fraud schemes, placing this district among the nation's leaders in the number of health care fraud indictments returned within that time frame. The indictments involved over $120 million in Medicare funds the government alleged – proved at trial – was pilfered from the Medicare trust fund.

Miami-based clinic employees and operators, such as De Oleo, have played a crucial role in fueling the Medicare fraud epidemic plaguing this community. De Oleo and others have imported fraud schemes into the Eastern District of Michigan, exploiting both indigent Medicare beneficiaries and the Medicare program along the way. Of the schemes noted above, at least $34 million of the fraud alleged by the government came from eight separate schemes imported from the Miami area to the Detroit, Michigan area.

All of the money involved in the scheme came from the Medicare program. The program, funded by American taxpayers, is intended to provide health insurance for the elderly and disabled. Every dollar that De Oleo helped divert from this program – and into the pockets of himself and his co-conspirators – is a dollar that could have been used to provide valuable services to Medicare beneficiaries. The Court's sentence should reflect the scope and seriousness of this specific offense, as well as the need to promote respect for the criminal fraud laws in the Eastern District of Michigan.

### (3) The kinds of sentences available

For Counts 1-6, the maximum term of imprisonment is 10 years, pursuant to 18 U.S.C. § 1347. For Counts 7 and 8, the maximum term of imprisonment is 10 years, pursuant to 18 U.S.C. § 1957(b)(1). The maximum fine is $250,000 per count or twice the pecuniary gain or loss. Because the loss in this case was $1,789,234.74, the maximum fine is $3,578,469.48.

### (4) The sentencing range established by the United States Sentencing Guidelines ("USSG")

The Probation Department calculated an offense level of 33, with a guidelines range of 135-168 months based on De Oleo's Criminal History Category I criminal history. The Probation Department calculated this offense level and range as follows: (1) defendant De Oleo's conduct fell within Section 2B1.1 of the Sentencing Guidelines, which governs fraud cases and which provides a base offense level of 6; (2) a 20 level enhancement because the intended loss amount in this plea agreement is more than $7,000,000 but less than $20,000,000 pursuant to Section 2B1.1(b)(1)(k); (3) a two-level enhancement for use of sophisticated means pursuant to Section 2B1.1(b)(9)(C); (4) a one-level enhancement because of De Oleo's conviction under 18 U.S.C. § 1957 pursuant to Section 2S1.1(b)(2)(A); and (5) a four-level enhancement for his role

14

in the offence as a leader/organizer pursuant to Section 3B1.1(a).

As noted above, the government mostly agrees with the Probation Department's calculations. However, the government believes that the Court should apply the obstruction of justice enhancement pursuant to Section 3C1.1 for the reasons set forth in Section II(D) above.

**(5) Any pertinent policy statement issued by the USSC**

The United States is unaware of any pertinent policy statements issued by the United States Sentencing Commission. The recently enacted Patient Protection and Affordable Care Act, however, does provide the most recent evidence of Congressional intent in this area of the law. The PPACA specifically provides for increased sentences for health care fraud offenses, and further requires the United States Sentencing Commission to "ensure that the Federal Sentencing Guidelines and policy statements- (i) reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud; and (ii) provide increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." *Id.* at § 10606(a)(3). Under the new law, De Oleo's guidelines range would be either 210-262 (government's guidelines calculation) or 168-210 months (probation's guidelines calculation). *Id.* at § 10606(a)(2)(c).

**(6) The need to avoid unwarranted sentencing disparities among defendants with similar records**

The majority of the defendants already sentenced in this scheme had lesser roles than De Oleo, accepted responsibility and were involved in fewer fraud schemes. Yet, the owners, managers and principal employees at Xpress Center who have been sentenced all received sentences within the sentencing guidelines range applicable given their conduct and role. Daisy Martinez, a partner in the Xpress Center scheme and in two other schemes in the Detroit area,

15

received a guidelines sentence from Judge Rosen in a related case, *United States v. Martinez et al.*, Cr. No. 09-20200. Martinez had a loss figure of between $7 and $20 million (which included loss related to Xpress Center), received a four level enhancement for role and a two level enhancement for sophisticated means. She also received a three-level reduction for acceptance of responsibility. The resulting offense level was 29, with a guidelines range of 87 to 108 months. Judge Rosen sentenced Martinez to 96 months, in the middle of the guidelines range. While De Oleo has a similar loss figure and enhancements for role and means, he does not qualify for an acceptance of responsibility reduction and qualifies for additional enhancements for money laundering and, in the government's view, obstruction.

Dulce Briceno, who was recruited by De Oleo into the scheme to manage Xpress Center on his behalf, received a three-level enhancement for her role as a manager in the scheme, accepted responsibility, was responsible for an amount of loss between $1,000,000 and $2,500,000 and received an obstruction enhancement resulting in a offense level of 26. She received a sentence of 63 months incarceration. Briceno's subordinate at Xpress Center, Ingrid Mazorra, received a 37 month sentence, within her Guidelines range (offense level 21), after acceptance of responsibility and with no enhancement for any leadership role. Her sentence was later reduced pursuant to a Rule 35 motion.

Beyond the Xpress Center defendants, a sentence recently ordered by Judge Tarnow in the case *United States v. Bernice Brown*, Cr. No. 09-20213 may provide the Court with additional insight into how similarly situated defendants have recently been sentenced in this district. Like De Oleo, Brown was the organizer and mastermind of a scheme which resulted in intended losses of between $7 million and $20 million. She went to trial and was also convicted

16

on all counts. The only difference between the guidelines range for Brown and De Oleo is that the government believes De Oleo should receive additional enhancements for money laundering and obstruction. Judge Tarnow determined that the appropriate sentencing guidelines range for Brown was 121-151 months and sentenced Brown at the top of the guidelines range, to 151 months in prison.[1]

In this case, it is also appropriate to sentence De Oleo within a guidelines range which accounts for the intended loss for the various schemes in which he has been involved, his level of culpability, the sophisticated nature of the fraud, the illegal manner in which he disbursed the proceeds of the fraud, and his efforts to obstruct justice. The government is recommending as sentence of 168 months, which is at the top of the guidelines range as calculated by the Probation Department and at the bottom of the guidelines range suggested by the government. In light of the guidelines sentence given to Martinez – and the top end sentence given to Brown – a sentence of 168 months is not only appropriate but consistent with other sentences given to similarly-situated health care fraud defendants in this district.

---

[1] In that case, the government had sought an enhancement for obstruction as well, citing what it maintained was false testimony provided by Brown at trial. Judge Tarnow declined to apply the enhancement. Regardless, a sentence of 151 months fell within both the guidelines advocated by the government and the guidelines determine by the court. Similarly, if the Court in this matter declined to apply an enhancement for obstruction, a sentence of 168 months as recommended by the government would similarly fall within both guidelines ranges as calculated by Probation and the government.

## **RECOMMENDATION**

Based upon the considerations set forth above, the United States recommends a sentence of 168 months. The United States also requests that the Court impose a three year term of supervised release and order De Oleo to pay restitution in the amount of $1,789,234.74, jointly and severally with his co-conspirators in the fraud.

    Respectfully submitted,

    BARBARA L. MCQUADE
    *United States Attorney*

    s/Gejaa T. Gobena
    GEJAA T. GOBENA
    *Trial Attorney*
    *U.S. Department of Justice*
    *Criminal Division, Fraud Section*

Dated: February 28, 2011

## **CERTIFICATE OF SERVICE**

  I hereby certify that on February 28, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel for Defendants.

              s/Gejaa T. Gobena
              Trial Attorney
              U.S. Department of Justice
              1400 New York Ave., N.W.
              Bond Building, Third Floor
              Washington, D.C.  20005
              Phone:  (202) 305-1310
              E-Mail: gejaa.gobena@usdoj.gov